UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

WALTER S. JACKSON,                    )
                                      )
            Plaintiff,                )
                                      )
v.                                    )        No. 3:19-CV-377
                                      )
DAVID B. RAUSCH,                      )
                                      )
            Defendant.                )


## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's motion for summary judgment[1] [Doc. 42], Plaintiff's motion for preliminary injunction [Doc. 44], and Defendant's motion for partial summary judgment on Counts 1 and 5 [Doc. 55]. Defendant has responded to Plaintiff's motions for summary judgment and preliminary injunction [Docs. 58 & 57], and Plaintiff has responded to Defendant's motion for partial summary judgment [Doc. 64]. Plaintiff filed a reply brief to Defendant's response to Plaintiff's motion for preliminary injunction [Doc. 60] but did not file a reply for the motion for summary judgment and the time for doing so has passed. *See* E.D. Tenn. L.R. 7.1(a). Defendant has filed a reply brief

---

[1] While Plaintiff's motion for summary judgment is not styled as a motion for partial summary judgment, the Court will construe it as such since Plaintiff only raises arguments for Count 1 – *Ex Post Facto* violation, Count 5 – Due Process violation, and Count 9 – Unconstitutional Delegation. Count 9 will not be addressed in this memorandum as the Court has already dismissed this count in its prior memorandum opinion and order [Docs. 34 & 35]. On September 10, 2021, Defendant filed a motion for partial summary judgment [Doc. 66] as to the remaining counts, Counts 4, 7 & 8, which the Court will address in sum hereafter when the motion is ripe before the Court.

on his motion for partial summary judgment [Doc. 65]. This matter is now ripe before the Court.

For the reasons stated below, Plaintiff's motion for partial summary judgment [Doc. 42] will be **DENIED**, Defendants' motion for partial summary judgment [Doc. 55] will be **GRANTED**, and Plaintiff's motion for a preliminary injunction [Doc. 44] will be **DENIED without prejudice**.

## I.    Background

The facts of this case are largely undisputed by the parties. In 1989, while Walter Jackson ("Plaintiff") was living in Florida, his 8 or 9-year-old stepdaughter walked into the bedroom where Plaintiff was masturbating. Plaintiff immediately made his wife aware of the incident, and she did not instigate criminal charges against Plaintiff until 5 years later during a divorce proceeding. Plaintiff, at the advice of counsel in 1996, pled guilty to and was convicted of one count of violating F.S. 800.04(2), described as "a lewd or lascivious act in the presence of a child." Plaintiff was sentenced to serve 11 months and 29 days in county jail and 10 years of probation on May 28, 1996. He obtained early release for good behavior and successfully completed probation. When Plaintiff pled guilty and was sentenced, Florida did not have a sex offender registry, and Florida's registry did not become effective until June 1, 1997, after Plaintiff was released. Plaintiff was required to register in Florida, and he remained registered in Florida until he moved to Tennessee in 2006.

In 2005, Plaintiff decided to move to Monroe County, Tennessee and bought land on which to build a cabin. He retained the services of attorney Robert L. Jolley, Jr.

2

("Attorney Jolley") in 2006 to advise whether Plaintiff was required to register in Tennessee under the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004, as amended, Tenn. Code Ann. §§ 40-39-201-218 ("the Act"). Attorney Jolley, after reviewing both Florida and Tennessee statutes, concluded that Plaintiff was not required to register under the Act, but he sent a written inquiry to 10th Judicial Circuit Assistant District Attorney General James Harvey Stutts ("General Stutts") out of an abundance of caution. About a month later, General Stutts responded and stated that he concurred with Attorney Jolley's conclusion that Plaintiff was not subject to the Tennessee Sexual Offender Registry statute. General Stutts further stated that he did not think Plaintiff's Florida conviction met the criteria in Tennessee to require registration, nor did the factual basis correspond with any Tennessee offense that would require registration. Plaintiff has had no other criminal convictions, sexual or otherwise, since the Florida 1996 conviction.

In 2007, the Tennessee General Assembly passed an amendment to the Act. This amendment required persons registered in another jurisdiction to also register in Tennessee. This amendment applied to offenders who didn't fit Tennessee's criteria for registry but had been registered in other states. Plaintiff received two correspondences from the TBI in 2007, stating that they had received documentation that Plaintiff was a convicted sex offender and told Plaintiff to register at his local law enforcement agency. Plaintiff also received a letter on March 12, 2008, from the Monroe County Sheriff's Office stating that Plaintiff was subject to arrest unless he reported to register by April 2, 2008. However, Plaintiff did not register at that time, citing the 2006 determination of the 10th Judicial

3

District Attorney General's Office's determination that Plaintiff did not have to register. No follow up by TBI or the Monroe County Sheriff's Office to get Plaintiff to register was made until almost 11 years later, in 2019.

During the interim, Plaintiff established a successful business, the Lodge in Tellico Plains ("the Lodge") with his partner, Anna Davies ("Ms. Davies"). Ms. Davies has lived with Plaintiff the entire time he has been in Tennessee, and the two have been dating since around 2000. Plaintiff has owned and managed the Lodge with Ms. Davies for 14 years. The Lodge sits on 3.3 acres, is surrounded by forest and trails, and is situated a mile from Tellico Plains, a little village without a red light. Since the COVID-19 outbreak, the Lodge has had no staff besides Plaintiff and Ms. Davies. Most of the guests are motorcyclists.

In January 2019, Plaintiff received a phone call from the Monroe County Sheriff's Office stating that the TBI had directed that Plaintiff either register or be arrested. Plaintiff registered at this time and was informed that he was required to register for life, presumably because of the age of the victim. The Tennessee equivalent of Plaintiff's Florida offense is the indecent exposure act, which under Tenn. Code Ann. § 40-39-202(20)(A)(vii) does not qualify as a conviction for a "sexual offense, except upon a third or subsequent offense, nor is the underlying conduct listed under Tenn. Code Ann. § 40-39-203(31) as a violent offense. Therefore, Plaintiff argues, even though his conviction in Florida does not constitute a sexual offense under Tennessee law, after living in Tennessee for 13 years, and being told by the prosecuting authority in the 10th Judicial District of Tennessee that his Florida conviction did not require him to register in Tennessee, he has been forced to register in Tennessee as a sexual offender. However, Defendant argues that Plaintiff is

required to register under the Act for five years based solely on the fact that he had to register under Florida's sex offender registry, per the 2007 amendment.

Plaintiff states that since being forced to register, his business has experienced a decided downward trend[2], he has become publicly labeled a sexual offender, and has become subject to various restrictions on where he can live, work, or go since the Act requires all registrants to be listed in a public internet database, along with their home and work addresses and other identifying information. He has also retained two separate attorneys who have written three separate letters to the TBI outlining the facts pertaining to Plaintiff and requesting that Plaintiff be removed from the registry, which have been refused by the TBI.

Under the Act, Plaintiff must report each year in the month of his birthday to an office of the Monroe County Sheriff's Office and pay a fee of $150.00. Initially, Plaintiff was listed on the registry as a "violent sexual offender" who would be subject to registration for life. In June 2019, for reasons that remain unclear, Plaintiff was informed that he had been reclassified as a "sexual offender" and that, pursuant to Tenn. Code Ann. § 40-39-207(i)(4), he would be eligible to apply for removal from the registry after five years, in January 2024. Plaintiff was not afforded a hearing before this reclassification and has not been afforded a hearing or an explanation since being reclassified. Plaintiff claims

---

[2] While Plaintiff states he experienced a 20% drop in income the first quarter after he was forced to register, his tax records show an increase in profit overall in 2019. [Doc. 55, Ex 4]. Further, the COVID-19 pandemic has impacted businesses such as Plaintiff's, and the Court cannot determine whether a decrease in business after 2019 is due to Plaintiff's registry status or the continuing effects of the global pandemic.

5

that he lives with the uncertainty of knowing what interpretation of the Act will prevail at some future date.

Tennessee enacted its first sex offender registration law in 1994. In 2004, the 1994 Act was repealed and replaced by the Act which dramatically expanded the scope and burden of the 1994 Act. Since 2004, the Act has undergone numerous changes and amendments almost every year. Chief Judge Crenshaw of the Middle District of Tennessee has recounted the statutes' long history of more than two dozen revisions in *Doe v. Haslam*, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017), and this court will refer to that opinion for the details. Of relevance to this case, in 2007, the Act was amended to require individuals who were required to register as a sex offender in another state to also register in Tennessee for five years upon moving to the state. There is no mechanism under the Act to allow an individual to have his registration obligations eliminated or reduced. Further the Act, in its current form, subjects registrants to obligations, restraints, disabilities, and punishment of a different character and a greater order of magnitude than those imposed by the 1994 Act, or even the Act in its original 2004 form.

## II.    Analysis

Both Plaintiff's and Defendant's motions are brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment. Rule 56(a) provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion[.]" Fed. R. Civ. P.

6

56(c)(1). This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Additionally, a party may "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Moreover, mere conclusory and unsupported allegations, rooted in speculation, are insufficient to meet this burden. *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

To defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id*. at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id*. at 251-52.

### A. Timeliness Issue – Count 5

The parties have filed cross motions for summary judgment as to Plaintiff's retroactive due process claim, Count 5 of the Amended Complaint. Defendant has raised a

7

timeliness argument as to Count 5 that must be addressed before determining whether to address the merits of Plaintiff's claim. Defendant argues that Plaintiff's retroactive due process claim, Count 5, is barred by the statute of limitations. [Docs. 55 & 58]. Defendant argues that Plaintiff's registry restrictions were first imposed in 2007, due to an amendment to the Act. Because Plaintiff received a letter from the TBI in November 2007, Plaintiff knew or should have known the cause of action forming the basis of his retroactivity claim almost 12 years prior to his filing the immediate lawsuit in September 2019. [*Id.*]. Plaintiff responds that the statute of limitations did not begin to run until Plaintiff registered in 2019. Plaintiff avers that a cause of action in 2007 would have been moot as Plaintiff did not register at that time and was told he did not have to register in 2006, by the 10th Judicial District Attorney General's office. [Doc. 64].

It is well settled that in Tennessee claims under 42 U.S.C. § 1983 are subject to a one-year statute of limitations. Tenn. Code Ann. § 28-3-104(a)(1)(B); *Irick v. Ray*, 628 F.3d 787, 789 (6th Cir. 2010) ("civil actions for … injunctive relief brought under the federal civil rights statutes must be commenced within one year of the accrual of the cause of action"); *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005). However, "the accrual date of a § 1983 claim is a question of federal law that is not resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (emphasis in original). "Under federal law, the limitations period begins to run when a plaintiff knew or should have known of the injury that forms the basis of the claim." *Fox v. DeSoto*, 489 F.3d 227, 233 (6th Cir. 2007); *see also Holland v. Governor of Ga.*, 669 F. App'x 541, 542 (11th Cir. 2016)

8

("[t]he statute of limitations in these cases has only started to run after the plaintiff received some form of actual notice").

Here, Plaintiff was told in 2006 that he was not required to register under then Tennessee law by the 10th Judicial District Attorney General's Office. In 2007, after the Act was amended, Plaintiff was informed via two letters,[3] one from the TBI and one from the Monroe County Sheriff's Office, that he would have to register as the Act applied retroactively to him. While in 2006 Plaintiff would not have had to register because there was no requirement that a person registered as a sexual offender in another state would also have to register in Tennessee upon moving, the same cannot be said after the 2007 amendment.

Plaintiff has not presented evidence that he was advised by the 10th Judicial District Attorney General's Office after the 2007 amendment that he would not have to register. While Plaintiff was not "forced" to register until 2019, he was subject to the Act under the 2007 amendment and received notice by both the TBI and the Monroe County Sheriff's Office that he would have to register. Plaintiff did not register at that time. Accordingly, the Court finds that Plaintiff's retroactive due process argument is time-barred by the statute of limitations and will **GRANT** Defendant's motion for partial summary judgment [Doc. 55] as to Count 5. The Court will also **DENY** Plaintiff's motion for partial summary judgment [Doc. 42] as to Count 5. Count 5 will be **DISMISSED**.

---

[3] Plaintiff received a total of three letters, two from the TBI regarding his duty to register in 2007, and one letter from the Monroe County Sheriff's Office in 2008. However, the first of the TBI letters was addressed to a "Mr. Simmons." As such, the Court only considers two of the letters sent to have given Plaintiff actual notice that he was required to register under the Act.

9

## B. Count 1 – Ex Post Facto Violation

The parties have also filed cross motions for summary judgment as to Plaintiff's *Ex Post Facto* Clause claim, Count 1 of the Amended Complaint. Plaintiff argues that the Act as applied to Plaintiff violates the Ex Post Facto Clause based on the five factors as set forth in *Does v. Snyder*, 834 F.3d 696, 699 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017). Defendant argues that the effect of the Act as applied to Plaintiff is not punitive, and Plaintiff has not presented adequate proof "to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Smith v. Doe*, 538 U.S. 84, 92 (2003) (internal quotation marks and citations omitted).

Looking to the legal landscape, the Court notes that the Supreme Court has upheld the retroactive application of sex offender registries. *See Smith*, 538 U.S. 84. Likewise, the Sixth Circuit has previously upheld Tennessee's sex offender registry laws against similar challenges. *See, e.g., Doe v. Bredesen*, 507 F.3d 998, 1001 (6th Cir. 2007), *cert. denied*, 555 U.S. 921 (2008) (upholding the Act); *Cutshall v. Sundquist*, 193 F.3d 466, 474 (6th Cir. 1999), *cert. denied*, 529 U.S. 1053 (2000) (upholding the Act). However, the Tennessee General Assembly has expanded the scope of the Act's restrictions and the content of its reporting requirements, and the contours of Sixth Circuit precedent have changed in the years since *Cutshall* and *Bredesen*.

Although the Sixth Circuit has upheld the Act and its predecessor in the face of similar constitutional challenges, it has since found Michigan's parallel scheme unconstitutional as applied to a select group of plaintiffs, clarifying the analysis that must be employed when addressing these types of claims. *See Does v. Snyder*, 834 F.3d 696,

10

699 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017). *Snyder* set forth a five-factor analysis for *ex post facto* challenges to be used in conjunction with the "intents-effects" test established by the Supreme Court. *Id.*; *see also Smith*, 538 U.S. at 92.

Plaintiff first attacks the retroactive application of the Act under the *Ex Post Facto* Clause of the United States Constitution. Plaintiff contends that, as applied to him, the Act and its amendments are unconstitutional. Plaintiff asks for a declaration that the Act as applied to him is unconstitutional on *ex post facto* grounds, along with injunctive relief. Defendant contends that the Act's requirements do not have a punitive effect as applied to Plaintiff.

The Constitution provides that "No State shall . . . pass any . . . *ex post facto* Law." U.S. Const. art. I § 10, cl. 1. An *ex post facto* law is a "retrospective" law that applies "to events occurring before its enactment" and "disadvantage[s] the offender affected by it . . . by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997); *see Cutshall*, 193 F.3d at 476 ("[t]he clause is designed to protect against legislative abuses and to provide fair notice of the consequences of criminal actions"). The Constitution "does not bar all retroactive lawmaking, but only retroactive punishment." *Snyder*, 834 F.3d at 699. Relevant to the instant challenge, "[a] statute is enforced retroactively if it governs conduct that preceded the statute's enactment." *Shaw v. Patton*, 823 F.3d 556, 560 (10th Cir. 2016) (citing *Stogner v. California*, 539 U.S. 607, 612–13 (2003)). In the instant case, Plaintiff challenges the application of the 2007 amendment and the requirement of five years compliance with the

11

Act due to his conduct in 1996, and his move to Tennessee in 2006. There is no dispute that the Act is being enforced retroactively as to Plaintiff.

The Court begins its analysis with the Supreme Court's decision in *Smith v. Doe*, 538 U.S. 84 (2003). *See Rausch*, 382 F. Supp. 3d at 793. In *Smith*, the Court established an "intents-effects" test when weighing challenges to sex offender registry laws under the Ex Post Facto Clause. 538 U.S. at 89. Under the "intents-effects" test, the Court asks: (1) did the legislature intend to impose punishment; and (2) if not, is the statutory scheme "so punitive in either purpose or effect as to negate [the State's] intention to deem it civil." *Id*. at 92; *Snyder*, 834 F.3d at 700; *Millard v. Rankin*, 265 F. Supp. 3d 1211, 1223 (D. Colo. 2017); *see also Cutshall*, 193 F.3d at 477.

Here, the parties agree that the "intent-effects" analysis is appropriate framework to evaluate the present motions. Likewise, the parties appear to agree that the Tennessee General Assembly did not intend for the Act or the subsequent amendments to be punitive. *See* Tenn. Code Ann. § 40-39-201(b)(8) ("in making information about certain offenders available to the public, the general assembly does not intend that the information be used to inflict retribution or additional punishment on those offenders."); *Ward v. State*, 315 S.W.3d 461, 470 (Tenn. 2010) ("[t]he plain language of this statute expresses a nonpunitive intent to protect the public"). Consequently, "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Smith*, 538 U.S. at 92 (*quoting Hudson v. United States*, 522 U.S. 93, 100 (1997)). Because this is an as-applied challenge, the Court's constitutional inquiry is limited to Plaintiff's particular situation and circumstances. *See Reno v. Flores*, 507 U.S. 292, 300

12

(1993) (an as-applied challenge is limited to review of how a statute has been "applied in a particular instance"); *see also Women's Medical Prof. Corp. v. Voinovich*, 18 130 F.3d 187, 193 (6th Cir. 1997), *cert. denied*, 523 U.S. 1036 (1998). Courts look to five non-dispositive guideposts when evaluating the actual effects of a statute: (1) Does the law inflict what has been regarded in our history and traditions as punishment? (2) Does it impose an affirmative disability or restraint? (3) Does it promote the traditional aims of punishment? (4) Does it have a rational connection to a non-punitive purpose? (5) Is it excessive with respect to this purpose? *Snyder*, 834 F.3d at 701 (citing *Smith*, 538 U.S. at 97).

### 1. Does the Act inflict upon Plaintiff what has been regarded in our history and traditions as punishment?

Plaintiff argues that he was originally classified as an offender who required lifetime registry, but he was later changed to a classification which only requires registry for five years before requesting removal. Plaintiff contends that he was arbitrarily reclassified without notice, a hearing, and legal authority or statutory guidance. Plaintiff also argues that being required to comply with the "very burdensome" restrictions of the act is punishment. Defendant contends that, unlike in *Snyder* where the Sixth Circuit concluded that Michigan's Sex Offender Registry ("SORA") resembled colonial-era shaming, the Act, as applied to Plaintiff, does not resemble the traditional punishments of banishment, shaming, or probation or parole.

A legal obligation may be characterized a "legal punishment" if: (1) it involves pain or other consequences typically considered unpleasant; (2) it follows from an offense

Case 3:19-cv-00377-RLJ-DCP   Document 70   Filed 09/21/21   Page 13 of 25   PageID #: 929

against legal rules; (3) it applies to the actual (or supposed) offender; (4) it is intentionally administered by people other than the offender; and (5) it is imposed and administered by an authority constituted by a legal system against which the offense was committed. *Snyder*, 834 F.3d at 701 (*quoting* H.L.A. Hart, Punishment and Responsibility 4–5 (1968)). The *Snyder* court concluded that the Michigan statute specifically resembled the punishment of banishment as it related to the geographical restrictions on where registrants could live or work. *Id.* at 701–02. Similarly, the *Snyder* court found that Michigan's SORA resembled "traditional shaming punishments" by publishing tier classifications based on "the state's estimation of present dangerousness without providing for any individualized assessment." *Id.* at 702. Finally, *Snyder* concluded that the Michigan statute resembles the punishment of "parole/probation" because of the numerous restrictions on where registrants can live and work and the requirement that they report in person, rather than by phone or mail. *Id.* at 703.

Here, the requirements of the Act do not impose pain on Plaintiff, but they do impose unpleasant consequences that flow from a criminal conviction and are administered by the TBI. While Plaintiff's criminal conviction is a matter of public record, the Act requires Defendant to publish that information, along with other personal information about Plaintiff—date of birth, home and work addresses, driver's license number, license plate number and description of all vehicles, etc.—on a publicly accessible website for the duration of Plaintiff's time on the Registry. *See* Tenn. Code Ann. 40-39-206(d).

It is not necessarily unreasonable that the Act includes a passive website that requires the public to "take the initial step of going to the [website], proceed to the sex

14

offender registry, and then look up the desired information." *Id*. However, the Act also requires registrants to obtain and "always have" state-issued photo identification, Tenn. Code Ann. § 40-39-213(a), that "shall bear a designation sufficient to enable a law enforcement officer to identify the bearer of the license or card as a sexual offender, violent sexual offender or violent juvenile sexual offender." Tenn. Code Ann. § 55-50-353. Because "[s]tate-issued photo ID is a virtual necessity these days" and must be shown "to enter some businesses, to cash checks, to get a job, to buy certain items, and more," *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M. D. Ala. 2019), the Act's requirement compels registrants to "appear in public with some visible badge of past criminality." *Smith*, 538 U.S. at 99. However, while the Act permits counties and municipalities to affirmatively notify "residences, schools and child-care facilities" when a registrant "resides, intends to reside, or, upon registration, declares to reside within a certain distance," through flyers, mailers, newspaper notices, and internet publications, charging registrants a yearly fee to defray the cost, Plaintiff has provided no evidence that this has happened to him. Tenn. Code Ann. § 40-39-217.

As to the effect of banishment, Plaintiff avers that he is selling his house and business and moving to a new home but worries that the Acts' restrictions will prevent him from finding a suitable place to move. He further expresses anxiety about using a realtor as he is concerned due to the stigma of being labeled a sexual offender and the difficulties in finding a residence which complies with the Act's exclusion zone requirements. Plaintiff also does not leave the house very often for fear of violating the Act as the exclusion zones are complicated and change depending on where you are. Plaintiff knows the exclusion

15

zones for Tellico Plains, but has had trouble figuring out the zones for other areas so he tries to avoid going anywhere outside of Tellico Plains. [Doc. 45, p. 8]. Defendant contends that Plaintiff does not live in a densely populated area and has not submitted a map prepared by an expert witness to show how the exclusion zones burden Plaintiff. [Doc. 56, p. 7]. While Plaintiff has imposed extreme restrictions upon himself by mostly confining himself to his home, Plaintiff has not shown that the Act has placed restrictions equivalent to banishment as applied to him.

As to the effect of shaming, Plaintiff stated that since registering, people who were once friendly with him turn away from him on the street or ignore his presence entirely, local restaurants and the Visitors Center who used to refer visitors to the Lodge have stopped doing so, and longtime repeat customers have either canceled their reservations or stopped making new ones. [Doc. 43, p. 13]. Further, Plaintiff dreads going anywhere he may have to show his driver's license as he has a sexual offender designation on his license as required by the Act. [Doc. 42, Ex. 1]. Defendant contends that Plaintiff is classified as a "sexual offender" which accurately reflects what Plaintiff did to end up with such a label without inflicting additional ignominy beyond that already inflicted by publicly available information relating to the reasons for the classification as opposed to a more descriptive classification. [Doc. 56, pp. 7-8] (internal citations omitted). While "attendant humiliation" may be an acceptable "collateral consequence of a valid regulation," the Act's restrictions as applied to Plaintiff do resemble shaming due to the driver's license designation requirement. *Smith*, 538 U.S. at 99.

16

Finally, the reporting and travel requirements, similar to those in *Snyder*, are much like the punishment of probation or parole. Registrants must update changes in their information within 48 hours, *see* Tenn. Code Ann. § 40-39-203(a)(4), and sexual offenders must report in person every year within a 14-day period surrounding their birthday. Tenn. Code Ann. § 40-39-204(c). Plaintiff testified that the registration requirements have limited his ability to travel to other states due to each state's rules regarding registration. [Doc. 45, p. 8]. Ms. Davies' family lives in Maryland, and Plaintiff and Ms. Davies used to travel there every year for the holidays, but the restrictions on travel have made it difficult to do so. [Doc. 42, Ex. 1].

Registrants must disclose any "electronic mail address information, any instant message chat or other Internet communication name or identity information that the person uses or intends to use" within three days of creation or change. Tenn. Code Ann. § 40-39-203(a)(7). As another court has noted, while this type of provision is not so restrictive as to prohibit the use of the Internet and social media, the Act provides law enforcement a supervisory tool to monitor registered sex offenders using email and social media. *Millard*, 265 F. Supp. 3d at 1228. Thus, this provision "resembles the supervisory aspects of parole and probation and complements and continues the states' comprehensive supervision of registered sex offenders even after they are released from the express provisions of their parole or probation." *Id*. In sum, the Court finds that the restrictions of the Act as applied to Plaintiff are much like traditional punishments of shaming and probation, but not banishment.

### 2. Does the Act impose an affirmative disability or restraint on Plaintiff?

17

Plaintiff argues that, as in *Snyder*, the Act "places innumerable and significant restrictions on registrants" [Doc. 3, p. 9]. Because the Act restricts where registrants may live, work, or loiter, Tenn. Code Ann. § 40-39-211(d)(1)(A)–(B) (No sexual offender . . . shall knowingly . . . stand, sit idly, . . . or remain within" 1000 feet of schools, childcare facilities, public parks, playgrounds, or recreation centers when minors are present), Plaintiff argues that the Act puts "significant restraints on how registrants may live their lives." *Snyder*, 834 F.3d at 703. Here, Plaintiff is restricted on where he can live, work, travel, and engage in leisure activities with Ms. Davies. He must report in-person once a year for as long as he is on the registry, which is five years. Plaintiff has been content with his current residence until recently, has not experienced a dramatic change in income, and has been occasionally assisted in his compliance by law enforcement officers. However, the Act's restrictions are "direct restraints on personal conduct," particularly "since failure to comply with these restrictions carries with it the threat of serious punishment, including imprisonment." *Snyder*, 834 F.3d at 703. This factor indicates punitive effect and weighs in favor of Plaintiff.

### 3. Does the Act promote the traditional aims of punishment against Plaintiff?

While Plaintiff concedes that this factor carries less weight, as the Act's overlapping goals could be described as civil, he argues that, like the Michigan statute at issue in *Snyder*, the Act "advances all the traditional aims of punishment: incapacitation, retribution and specific and general deterrence." 834 F.3d at 701. Plaintiff asserts that the "onerous 'exclusion zones'" of the Act functionally equate to banishment and the published "tier

18

classifications corresponding to the state's estimation of present dangerousness without providing for individual assessment" equates to shaming. [Doc. 43, p. 12 (*citing Snyder*, 834 F.3d at 701]. Here, unlike in *Snyder*, the restrictions on Plaintiff are not permanent. However, the restrictions are imposed based on his former conviction in Florida, not his likelihood of re-offense. Likewise, the exclusion zones track the aims of specific deterrence and incapacitation by limiting Plaintiff's access to places and areas around places where children may be.

Although the Act's restrictions promote deterrence, both the Supreme Court and the Sixth Circuit have emphasized that a deterrent purpose does not make a statute criminal. *Snyder*, 834 F. 3d at 704 ("To hold that the mere presence of a deterrent purpose renders such sanctions criminal would severely undermine the Government's ability to engage in effective regulation." (*quoting Smith*, 538 U.S. at 102)). In other words, the same characteristics that support traditional punitive aims "can also rightly be described as civil and regulatory." *Snyder*, 834 F.3d at 704. On balance, the Court finds that the non-permanence of the Act's restrictions as applied to Plaintiff, based solely on his prior offense rather than a present potential of re-offense, do not weigh in favor of Plaintiff.

### 4. Does the Act have a rational connection to a non-punitive purpose?

According to the Sixth Circuit, "the Act's rational connection to a nonpunitive purpose is a '[m]ost significant' factor in our determination that the statute's effects are non-punitive.' *Snyder*, 834 F.3d at 704 (*quoting United States v. Ursery*, 518 U.S. 267, 290 (1996)). Plaintiff argues that Defendant and the State of Tennessee cannot present proof that the Act accomplishes the "Legislative Findings" that accompanied the Act in 2004.

19

Plaintiff cites to the studies placed in the record in *Snyder*, that cast "significant doubt" on the Supreme Court's finding that "[t]he risk of recidivism posed by sex offenders is 'frightening and high." *Snyder*, 834 F.3d at 704 (*quoting Smith*, 538 U.S. at 103). Plaintiff argues that "the primary rationale behind the public policy for promulgating sex offender registries, and the ostensibly justified ever increasing limitations on where sex offenders could work, live, and how they could reintegrate into society, has been repudiated." [Doc. 43, p. 16].

Defendant argues that the Tennessee General Assembly listed eight reasons for enacting the Act, specifically stating, "[i]n balancing the sexual offender's and violent sexual offender's due process and other rights against the interests of public security, the general assembly finds that releasing information about offenders under the circumstances specified in this part will further the primary governmental interest of protecting vulnerable populations from potential harm. . ." [Doc. 58, p. 12] (*quoting* Tenn. Code Ann. § 40-39-201(b)(4)). Defendant argues that as applied to Plaintiff, Plaintiff was convicted of committing "a lewd or lascivious act in the presence of a child," and the General Assembly declared that "sexual offenders who prey on children…present an extreme threat to public safety. Sexual offenders pose a high risk of engaging in further offenses…and protection of the public from these offenders is of paramount public interest…" [*Id.*] (*quoting* Tenn. Code Ann. § 40-39-201(b)(1). "The registry's aim is to provide the public with information that already exists in public records so that members of the public may take whatever safeguards they deem appropriate." *Doe v. Gwyn*, 2011 WL 1344996, *14 (Tenn. Ct. App. Apr. 8, 2011). Further, Defendant avers that Plaintiff knew that under Florida's registry,

20

he had to "abide" by Tennessee's law if he moved here and that Plaintiff had to register in Florida until he moved to Tennessee [Doc. 58, p.13]. Thus, the Act ensures continuity between the state Plaintiff left and his new home state. [*Id*.].

The Act sets forth various legislative findings, including:

> • "Repeat sexual offenders, sexual offenders who use physical violence and sexual offenders who prey on children are violent sexual offenders who present an extreme threat to the public safety. Sexual offenders pose a high risk of engaging in further offenses after release from incarceration or commitment and protection of the public from these offenders is of paramount public importance."
> • "It is a compelling and necessary public interest that the public have information concerning persons convicted of sexual offenses . . . to allow members of the public to adequately protect themselves and their children from these persons."
> • "Persons convicted of these sexual offenses have a reduced expectation of privacy because of the public's interest in public safety."
> • ". . . releasing information about offenders under the circumstances specified in this part will further the primary governmental interest of protecting vulnerable populations from potential harm."
> • "The registration of offenders . . . along with the public release of specified information concerning offenders, will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems that deal with these offenders."
> • "To protect the safety and general welfare of the people of this state, it is necessary to provide for continued registration of offenders and for the public release of specified information regarding offenders. This policy of authorizing this release is necessary and relevant information about offenders to members of the general public is a means of assuring public protection and shall not be construed as punitive."

Tenn. Code Ann. § 40-39-201(b). These stated goals include several non-punitive purposes, such as public scrutiny of the criminal and mental health systems that deal with sex offenders, reduction of recidivism, and providing for the protection of the public.

Here, there is no indication that the restrictions of the Act have kept Plaintiff from re-offending, particularly in this case where Plaintiff has not committed *any* criminal acts

since his 1996 Florida conviction, let alone any criminal sexual acts during the 12-year gap from when the Act first became applicable to him and when TBI enforced Plaintiff's registration. This factor weighs slightly in favor of Plaintiff.

### 5. Is the Act excessive with respect to its purposes?

Plaintiff argues that "[t]here is nothing that the State of Tennessee can show to counterbalance" the negative effects of the Act with the positive effects sought through the Act. [Doc. 43, p. 16]. Plaintiff particularly emphasizes that violations of the prohibitions and requirements are subject to stiff criminal sanctions. Plaintiff does not point to any specific examples of how the Act has had a punitive effect on him, but instead relies on hypothetical situations, the First Amendment anonymity issue discussed below, and other cases in this district, this state, and other states. [Doc. 43, pp. 18-19]. Defendant asserts that because sexual offenders pose a high risk of engaging in further offenses, the Act is intended to balance a sexual offender's rights with protecting the public, and Plaintiff was convicted of committing a lewd or lascivious act in the presence of a minor, a vulnerable person, five years registration is not excessive with respect to the Act's purposes.

Here, Plaintiff relies on the Court's rulings in other cases and *Snyder* to assert that the Act violates the *Ex Post Facto* Clause as applied to Plaintiff. However, there is a distinct difference between the plaintiffs cited in those cases and Plaintiff – Plaintiff is only subject to the Act's restrictions for five years, whereas those plaintiffs were subject to the Act for life. Plaintiff has not provided authority to this Court where the Act was found to violate the *Ex Post Facto* Clause when a person was only subject to the Act for five years. Further, the holdings in the cases cited by Plaintiff were narrowly tailored to apply to those specific

22

plaintiffs. Even if the effects of the Act on Plaintiff are unpleasant for him, no prior court has determined that five years is excessive to the point of being punitive, and the Court is not inclined to extend the prior holdings to include Plaintiff.

### 6. Conclusion

Plaintiff has not shown that the Act as applied to him is so punitive in nature as to violate the *Ex Post Facto* Clause of the Constitution. Accordingly, the Court will **GRANT** Defendant's motion for partial summary judgment [Doc. 55] as to Count 1. The Court will also **DENY** Plaintiff's motion for partial summary judgment [Doc. 42] as to Count 1. Count 1 will be **DISMISSED**.

### C.  *Plaintiff's Motion for Preliminary Injunction*

Plaintiff has also filed a motion for a preliminary injunction on the grounds that the retroactive application of the Act against Plaintiff violates the *Ex Post Facto* Clause, Count 1 of the Amended Complaint. [Doc. 45]. Defendant argues that a preliminary injunction motion is moot as Plaintiff has also filed for summary judgment and requested injunctive relief. In the alternative, Defendant argues that Plaintiff has not stated a sufficient basis for a preliminary injunction as he has not shown a strong likelihood of success on the merits. [Doc. 57].

When determining whether to issue a preliminary injunction, the Court considers whether Plaintiff has established four factors: 1) a strong likelihood of success on the merits; 2) that Plaintiff is likely to suffer irreparable harm without an injunction; 3) that the injunction would not cause substantial harm to others; and 4) that the injunction is in the public interest. *Winter v. National Res. Def. Council,* 505 U.S. 7, 20 (2008); *ACLU of Ky.*

23

*v. McCreary County, Ky.,* 354 F.3d 438, 445 (6th Cir. 2003). Although the factors are to be balanced, a finding that there is no likelihood of irreparable harm, *Winter,* 505 U.S. at 22, or no likelihood of success on the merits, *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000), is usually fatal. The Court need not address all the preliminary injunction factors where fewer are dispositive of the issue. *See In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985).

As discussed above, the Court has determined that Plaintiff is not entitled to injunctive relief based on Count 1, let alone preliminary injunctive relief. Thus, Plaintiff has not shown a likelihood of success on the merits of his *ex post facto* claim, Count 1. Accordingly, Plaintiff's motion for a preliminary injunction [Doc. 44] will be **DENIED without prejudice** as the Court has not disposed of or determined the likelihood of success on the merits of the remaining Counts of the Amended Complaint.[4]

## III. Conclusion

Accordingly, for the reasons above, Plaintiff's motion for partial summary judgment [Doc. 42] will be **DENIED**. Defendant's motion for partial summary judgment [Doc. 55] will be **GRANTED**. Counts 1 and 5 will be **DISMISSED**. Plaintiff's motion for preliminary injunction [Doc. 45] will be **DENIED without prejudice**. An order consistent with this opinion will be entered.

**IT IS SO ORDERED.**

ENTER:

---

[4] In his motion. Plaintiff specifically states that he "does not waive his claims in the [Amended] Complaint's other counts." [Doc. 45, p. 1, n. 1].

24

      s/ Leon Jordan
_____
United States District Judge
